Calvin Moore was indicted by the Jefferson County Grand Jury for first degree murder being charged with the shooting death of Larry Thomas McCracken. At arraignment he entered a plea of not guilty and not guilty by reason of insanity.
Following arraignment, at defense counsel's request, a mental competency hearing was held and appellant was found sane and competent to stand trial. Immediately after the competency hearing, a jury was empanelled and after hearing evidence presented at trial, found Moore guilty of second degree murder. His punishment was fixed at thirty years imprisonment. After giving prompt notice of appeal, a motion for a new trial was filed and denied. He is now before this court as an indigent with appointed counsel and free transcript.
The evidence presented to the jury at the appellant's competency hearing showed that Moore was a twenty-five-year-old male, who, according to his mother, had not been normal since birth. She testified that, at age of nine or ten, Moore was struck on the back of the head with a baseball bat and that the injury required sutures. She said that following this injury, her son complained of frequent headaches, but their cause was never discovered.
Prior to the shooting in 1976, Moore was an in-patient at the University Hospital in Birmingham, Alabama. Moore's mother had informed the hospital staff that the patient was nervous, complained of headaches, and "shook a lot." She stated that, prior to her son's admission to the hospital, she had received complaints from her neighbors that he had been exposing himself in public.
Following his admission to the hospital, Moore was under the supervision of Dr. Teresa Young, a resident in psychiatry. Dr. Young was part of a treatment team and testified that the appellant had taken a battery of psychiatric and psychological tests. The results of these tests indicated that the appellant had an intelligent quotient of fifty-six, which placed him in a mildly retarded classification.
The appellant was also given a Bender-Gestalt test which indicated some degree of brain damage. However, no specific organic dysfunction was found by x-ray or electroencephalographic readings.
Dr. Young testified that the appellant had manifested paranoid psychotic characteristics in the form of hallucinations which involved "little green men" and a voice from the television telling the appellant that he would kill him. According to Dr. Young, the appellant was placed under heavy medication.
In October, 1976, Moore was discharged as an in-patient from the hospital. Shortly thereafter he received treatments on an out-patient basis at the Smolian Clinic in Birmingham. *Page 413 
The preceding paragraphs recite substantially what was presented at the appellant's competency hearing. In our judgment, there was sufficient evidence to present the question of appellant's sanity to the jury.
At the conclusion of the competency hearing, another jury was empanelled for the trial on the merits and the following evidence was presented to them.
The evidence tended to show that on the morning of December 3, 1976, Larry McCracken, the victim, took about seven dollars from the appellant, Moore. Moore demanded the return of his money, and when the deceased refused, Moore went home and returned with his brother's pistol. Moore again asked McCracken to return his money and, according to Sammy Thompson, an eyewitness, McCracken replied: "I'm going to give you your money."
Thompson stated that Moore walked up to McCracken. He further said that he did not see anything in Moore's hands. Thompson described what had occurred in the following manner:
. . . . .
 "Q But you saw Larry McCracken take some money out of his hat?
"A Yes, sir.
"Q What did he do with it?
 "A It looked like he was rushing him, he was trying to come up on Calvin, come up to him, and when he tried to come up, Calvin just shot. I don't know whether he had it in his hand or his pocket or whatever, but Larry McCracken was trying to walk up towards him."
Further cross-examination of Thompson:
 "A Calvin was just standing there, McCracken was coming towards him and Calvin said give me my money. And he went in his hat, just like this here, and he was going in his hat, and he throwed the money, he was still running up trying to rush the man with his hands by his side.
 "Q Did all of this happen just simultaneously, the rushing and throwing the money at the same time?
"A Yes, sir.
. . . . .
 "Q Just before this rushing and everything, was Calvin still talking about I want my money back?
"A Yes, sir.
 "Q In other words, I want my money back, throw, rush, bang?
"A Yes, sir.
 "Q How would you describe the way Calvin appeared just before the shot was fired?
"A Scared.
 "Q How would you describe the expression of Larry McCracken, if you can put a label on it?
"A I can't put no label on that.
. . . . .
 "Q Did Calvin make any move toward Larry McCracken whatever, with his hands, any type of gesture toward Larry McCracken before Larry McCracken actually started rushing toward him?
"A No. He was standing in one place."
On the evening of the shooting, after the appellant had surrendered himself to the police, he was given his Miranda
warnings. He said he understood them and then made a statement. The statement was recorded and admitted into evidence without objection.
In this recorded statement, Moore said that the deceased would not give him his money so he shot him. Further, Moore told the police that the deceased did not have a gun or a knife, and did not threaten him. Moore told the police that he drew the gun on McCracken when he (Moore) asked for the return of his money.
Several witnesses were called to testify to appellant's reputation in the community. Their opinion was that Moore was retarded, insane, confused, and did not know right from wrong. Further, he was known in his neighborhood as "Wheelbarrow Moore," a name derived from his shuffling gait, or "Mad Moore."
Dr. Young, on further questioning, testified that, although appellant had some difficulty in doing so, he could discern between right and wrong. *Page 414 
 I
The appellant contends that during opening statements the prosecution made comments concerning the defendant's past criminal record and time served in prison. He argues that this amounts to reversible error when the defendant does not take the stand and when the statement is unrelated to any attempt to show motive, intent, scienter or identity. The remarks in question are quoted below:
. . . . .
"MR. RUSSELL:
. . . . .
 "The question then comes down to this, whether or not this defendant, at the time of this shooting, at the time he killed Larry McCracken, was insane. I think you will probably hear medical testimony by the defense that this defendant was beaten up in the penitentiary by prison guards, I imagine back in '73 and '74, when the riots were going on down there at Atmore. . . ."
We have examined the opening statements by the prosecution and the defense attorney and have not found that any objection was made to this remark. In fact, at the conclusion of the defense attorney's opening statement, he made the following comment:
. . . . .
 "MR. BRYAN: I would move that there be no intentional references by Mr. Russell to the defendant's prior record. He hasn't taken the witness stand. Even though some things came out in the competency hearing, which was I think a little bit more relaxed atmosphere, I don't know if we will get to that stage where it might properly come out in this case."
 "MR. RUSSELL: I never have done that in eight years. The only time I would is if he tries to get into the victim's record.
 "MR. BRYAN: You mentioned it in your opening remarks and I didn't object to it at the time.
 "MR. RUSSELL: That was unintentional if I did. I apologize.
 "THE COURT: I can't rule on all these objections made to something that may come up. It's too speculative. I'll have to wait until I get to all of these objections. I think the Court of Appeals will understand that one."
In the absence of an objection by counsel, a motion to exclude, a ruling on the objection, or a refusal of the trial judge to rule thereon, improper argument or remarks by counsel are not subject for review by this court. Brown v. State,50 Ala. App. 471, 280 So.2d 177; Veith v. State, 48 Ala. App. 688,267 So.2d 480; Hutcherson v. State, 40 Ala. App. 417,114 So.2d 572.
However, an exception to this rule exists where the comment is so prejudicial that its effect is ineradicable. Anderson v.State, 209 Ala. 36, 95 So. 171; Christian v. State, Ala.,351 So.2d 623; Gunnels v. Jimmerson, Ala., 331 So.2d 247. But, in view of the materiality of the appellant's mental condition, we do not believe that the comment falls within this exception. See Lyons v. State, 53 Ala. App. 111, 298 So.2d 42.
It is our judgment that, without a timely objection, this court has nothing to consider.
 II
Next, the appellant insists that the trial court erred in sustaining objections by the prosecutor to defense counsel's questions which sought to enhance the victim's reputation for violence and show the history of his past crimes. He maintains there was sufficient evidence to show that the accused was acting in self-defense and therefore the deceased's reputation for violence was admissible.
In a prosecution for homicide the general rule is that the defendant may show the victim's bad general reputation for violence as tending to show the defendant's apprehension of peril where there had been evidence tending to show self-defense. McCaghren v. State, 52 Ala. App. 509,294 So.2d 756; Cole v. State, Ala.Cr.App., 337 So.2d 40; Body v. State,57 Ala. App. 593, 339 So.2d 650; Mitchell v. State, 53 Ala. App. 58, 297 So.2d 383. *Page 415 
The cases cited by appellant in support of his contention state that, where the evidence tends to show that the defendant acted in self-defense, the defendant may show that the deceased habitually carried a weapon. However, for such evidence to be admissible, there must be other evidence that the defendant knew of the deceased's habit. Wielen v. State, 47 Ala. App. 108,251 So.2d 240; Frazier v. State, 48 Ala. App. 210,263 So.2d 511; Glover v. State, 200 Ala. 384, 76 So. 300.
In the present case the appellant attempted to establish through Sammy Thompson and D.L. Weber, a sheriff's employee, that the deceased had been convicted of a federal offense of possessing a sawed off shotgun, and that he was on work release at the time he was killed.
No attempt was made to establish that the appellant knew the deceased carried a weapon. In fact, appellant told police the deceased had no weapon and made no threats to him. Further, the fact that the deceased was once convicted of possession of a weapon does not show habit or that he was a "pistol toter."
Based on the foregoing, it is our judgment that no reversible error is shown in the action of the trial court in sustaining the prosecutor's objection.
 III
Finally, the appellant asserts that the evidence was not sufficient to sustain the appellant's conviction for murder in the second degree.
In the present case appellant had made a motion to exclude the State's evidence and moved for a directed verdict on the ground that the shooting was in self-defense. After these motions were denied the appellant contended, as a basis for a motion for a new trial, that the verdict was contrary to the law and against the preponderance of the evidence.
Self-defense, like alibi evidence and all other conflicting evidence, is a question for the jury to determine. Graham v.State, Ala.Cr.App., 339 So.2d 110. To excuse one charged with murder on the grounds of self-defense, the accused must neither provoke nor encourage the difficulty, and must at the time have been, or appeared to have been, so menaced as to create a reasonable apprehension of loss of life or grievous bodily harm. There must be no reasonable mode of escape from the menace. McDonald v. State, Ala.Cr.App., 340 So.2d 80.
The evidence in the present case showed that Moore confronted the victim with a gun and demanded the money that the victim had taken from him. Further, the appellant stated to the police that he shot the deceased because he did not return his money and that he had not been threatened by the deceased. Without question, under these facts the jury could determine that the killing was not done in self-defense
The testimony presented in this case falls short of the legal test of insanity. See Parsons v. State, 81 Ala. 577, 2 So. 854;Barbour v. State, 262 Ala. 297, 78 So.2d 328. Where sufficient mental capacity exists to entertain the requisite criminal intent, neither abnormality nor sub-normality will preclude liability for the commission of a crime. Parker v. State, Ala.Cr.App., 351 So.2d 927; Lee v. State, 265 Ala. 623,93 So.2d 757.
Moore's retardation is not compelling evidence of insanity. Dr. Young stated that it would be her opinion that the appellant was able to "comprehend his surroundings," and to judge the difference from right and wrong.
The defense of insanity must be proved to a reasonable satisfaction of the jury and the burden is on the appellant to do so. Breen v. State, 53 Ala. App. 588, 302 So.2d 562.
Where evidence is presented that supports and contradicts a plea of not guilty and not guilty by reason of insanity, a jury question is presented. Rickard v. State, 283 Ala. 534,219 So.2d 363. *Page 416 
Under the facts of this case, sufficient evidence was presented to the jury on whether or not the appellant was insane. In view of the jury's guilty verdict, that question was not resolved in appellant's favor.
In our judgment, the trial judge properly overruled the motion to exclude, the motion for a directed verdict, and the motion for a new trial.
After reviewing the record, we have found no error and therefore, the judgment of the trial court is due to be affirmed.
AFFIRMED.
All the Judges concur.